UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MARK WILLIAMS,

        Plaintiff,

v.                                         Case No. 3:15-cv-1126-J-34JRK

LIEUTENANT BRIAN DUNCAN,

        Defendant.

_____

## ORDER

### I. Status

Plaintiff Mark Williams, an inmate of the Florida penal system, initiated this action

on September 16, 2015, by filing a Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C.

§ 1983. Williams filed an Amended Complaint on February 17, 2016 (Doc. 10); a Second

Amended Complaint on February 22, 2016 (Doc. 12); a Third Amended Complaint on

June 22, 2016 (Doc. 15); and a Fourth Amended Complaint on January 26, 2017 (FAC;

Doc. 20). In the FAC, Williams names one Defendant, Lieutenant Brian Duncan, in his

individual capacity. Williams asserts that Duncan violated his Eighth Amendment right to

be free from cruel and unusual punishment based upon an incident that occurred on June

4, 2015. See FAC at 5. As relief, he seeks punitive damages, costs, and attorney's fees.

Id. at 6-7.

This matter is before the Court on Duncan's Motion for Summary Judgment

(Motion; Doc. 40), filed on December 4, 2017. In the Motion, Duncan asserts that the

Court should grant summary judgment in his favor for the following reasons: (1) he is

entitled to qualified immunity; (2) Williams fails to state a claim for relief under the Eighth

Amendment; and (3) Williams' claim is precluded under 42 U.S.C. § 1997e(e) because he has established no more than a <u>de minimis</u> injury and has sought only punitive damages. <u>See</u> Motion at 17. In support of the Motion, Duncan provides the following evidence: (1) fixed wing and handheld videos (Ex. A)[1]; (2) Disciplinary Report Worksheet (Ex. B; Doc. 41-1); (3) the transcript of Williams' deposition, taken on September 3, 2017 (Ex. C; Doc. 41-2); (4) Duncan's own declaration[2] (Ex. D; Doc. 41-3); (5) Williams' medical records (Ex. E; Doc. 42-1); and (6) the declaration of Dr. Albert C. Maier (Ex. F; Doc. 42-2).

The Court previously advised Williams of the provisions of Rule 56, Federal Rules of Civil Procedure (Rule(s)), and notified him that the granting of a motion for summary judgment would represent a final adjudication of this case, which may foreclose subsequent litigation on the matter. <u>See</u> Order of Special Appointment; Directing Service of Process Upon Defendant; Notice to Plaintiff (Doc. 25) at 3-4, ¶ 10. On February 1, 2018, after Williams failed to respond to the Motion, this Court issued an order directing Williams to show cause why the case should not be dismissed for Williams' failure to prosecute the action and giving him an additional opportunity to respond to the Motion. <u>See</u> Order (Doc. 47). Thereafter, Williams responded to Duncan's Motion in a one-page document with no supporting evidence (Response; Doc. 48). However, when he filed his verified FAC, he also submitted a declaration from inmate Octavies Johnson (Johnson Dec.; Doc. 21). Duncan's Motion is now ripe for judicial review.

---

[1] With leave of Court, Duncan filed the videos under seal. <u>See</u> Order (Doc. 45).

[2] The original declaration of Defendant Duncan submitted as an exhibit in support of his Motion was not signed (Doc. 41-3). On December 12, 2017, Duncan filed a signed and dated declaration (Doc. 44-1).

## II. Plaintiff's Allegations[3]

In his verified FAC,[4] Williams asserts that Duncan ordered officers to leave him fully restrained in his cell for over sixteen hours after Williams attempted to kick a sergeant[5] who had placed Williams on seventy-two-hour property restriction. See FAC at 5-6. Williams alleges that he attempted to kick the Sergeant while he was being escorted back to his cell following the officers' removal of his personal property. In response to the attempted kick, "Duncan had each officer [] place shackles on [his] feet, black box an[d] metal chains behind [his] back," while he was wearing only pants. Id. at 6. According to Williams, the officers then picked him up while he was "hog-tied," and "toss[ed]" him into his cell, where he remained for over sixteen hours on Duncan's order. See id. Williams contends that Duncan "was the only one who could authorize[] for the restraints to be removed." Id.

Williams asserts that, while restrained in his cell, he urinated and defecated on himself, caught a cold from lying on the bare floor, suffered severe swelling of the wrists and ankles, and suffered back pain. In addition to the swelling of his wrists, Williams alleges that he suffered nerve damage in both hands resulting from the tightness of the black box. Id. He further asserts that Duncan left him "in that position with no running water until way past shift change" in violation of Florida Department of Corrections

---

[3] In considering a motion for summary judgment, the Court views all disputed facts and draws all reasonable inferences in the light most favorable to Williams. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002). As such, the recited facts may differ from those that ultimately can be proved at trial.

[4] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

[5] The sergeant's last name is also "Williams." To avoid confusion, the Court will refer to the relevant employee as "the Sergeant."

(FDOC) policy that permits the use of restraints for up to six hours. Id. In support of his

FAC, Williams offers the declaration of Octavies Johnson, who avers the following:

> I observe[d] inmate [Williams] come out [of] the shower an[d]
> tried to kick [the Sergeant]. The [officers] slammed him on the
> floor, an[d] . . . Lt. Duncan had them [] pick him up . . . an[d]
> toss him on the floor in his empty cell. He just had on his pants.
> He stayed like that until 3:30 a.m. the next day . . . . [t]hey did
> not feed him lunch or dinner an[d] he kept yelling he wanted
> the restraints off. The [officers] kept telling him that Lt. Duncan
> is the only [one] that can authorize[] them to be removed. Lt.
> Duncan went home at 6 p.m. [that day], an[d] inmate
> [Williams] was still on the floor saying he [had] to use the
> restroom but can't get up [be]cause of the tight restraints.

See Johnson Dec.

### III. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Rule 56(a). The record to be considered on a motion for

summary judgment may include "depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes

of the motion only), admissions, interrogatory answers, or other materials." Rule

56(c)(1)(A).[6] An issue is genuine when the evidence is such that a reasonable jury could

return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d

---

[6] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of
> subdivision (a) continues to require that there be no genuine dispute as to any material fact
> and that the movant be entitled to judgment as a matter of law. The amendments will not
> affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). Thus, if an incident is recorded and the video "obviously contradicts" the version of events described by the plaintiff, a court can accept the depiction of the events as shown on the video. <u>Pourmoghani-Esfahani v. Gee</u>, 625 F.3d 1313, 1315 (11th Cir. 2010); <u>see also</u> <u>Morton v. Kirkwood</u>, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible."). But if the video does not clearly depict the events, or if it can support both versions of events, the court will accept the plaintiff's version for purposes of ruling on a motion for summary judgment. <u>Shaw v. City of Selma</u>, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

### IV. Law and Conclusions

In his deposition, Williams testified that when the escorting officers first took him down to the floor after his assault on the Sergeant, they used excessive force against him (twisting his wrist, pulling on his fingers and toes, poking his eyes). <u>See</u> Ex. C at 7. However, he has offered no evidence, and indeed has not even alleged that Duncan, the sole defendant in this action, directed the individual officers to do so or knew of the individual officers' alleged attempts to cause him pain. Moreover, when asked in his deposition how Duncan violated his Eighth Amendment rights, Williams responded saying, "[b]y leaving me in a cell fully re[s]trained with a black box and chains behind my back after I was beat up by officers for, like, 18 hours." <u>See</u> Ex. C at 4. Notably, Williams named some of the other officers (and included the allegations regarding their actions) in his first three complaints (Docs. 1, 10, 12, 15),[7] but, in his FAC, he names only Duncan

---

[7] In his original complaint, Williams named the Sergeant, Duncan, C.O. Gabbard, Lieutenant Espito, and Sergeant Korey or Corey (Doc. 1); in his amended complaint, Williams named Sergeant Corey, C.O. Gabbard, and Sergeant Williams (Doc. 10); in his second amended complaint, Williams named Duncan and Captain Espitio (Doc. 12); and in his third amended complaint, Williams named Duncan and Lieutenant Esipito (Doc. 15). Presumably, Espito, Espitio, and Esipito reference the same individual.

and limits his claims to Duncan ordering that he be shackled, hog-tied, tossed in his cell, and left in restraints. See FAC at 1, 3. Because Williams abandoned his claim for excessive use of force against the other officers, the Court limits its consideration to the claim actually pled against Duncan—that he ordered the officers to "place shackles on [his] feet, black box an[d] metal chains behind [his] back with nothing but [his] pants on," then have him "toss[ed]," while hogtied, on the cell floor and left there for over sixteen hours with no running water. Id. at 6.

In support of his Motion, Duncan provides videos[8] that depict the events that precipitated Duncan's order to leave Williams restrained in his cell. See Ex. A. Williams does not question the authenticity of the video footage and even references the footage in support of his Response. See Response. The video footage indisputably contradicts many of Williams' assertions.

First, although Williams and Johnson assert that Williams was wearing only pants, the video evidence clearly shows that Williams was wearing more than just pants. See Ex. A. In fact, when officers initially removed Williams from his cell to execute the property restriction order, Williams was fully clothed, wearing not only pants, but two shirts and socks. See id. And when officers returned Williams to his cell, he was still fully clothed. See Ex. A.

---

[8] The fixed-wing camera depicts Williams' extraction from his cell and placement in a holding cell, the incident that prompted officers to use force to immobilize Williams, the return of Williams to his cell following the incident, and another ten minutes of footage of Williams' cell door, through which Williams can be seen pacing. The hand-held video depicts the officers holding Williams on the floor, Duncan's explanation of what occurred, the officers' return of Williams to his cell, and Williams' actions inside his cell immediately after he is returned. The fixed-wing video has no sound, while the hand-held video does. In the hand-held video, Duncan identifies himself. See Ex. A.

Second, contrary to Williams' assertion in his FAC, Duncan did not order him to be "hogtied" after his assault on the Sergeant.[9] Williams was already fully restrained at the time he attempted to kick the Sergeant; the officers who removed him from his cell to execute the property restriction order placed him in shackles to safely escort him. The video establishes that after the assault on the Sergeant, Duncan did not order any additional restraints be applied. Indeed, no additional restraints were added, nor were his restraints moved or adjusted. See Ex. A. Notably, Duncan can be heard on the video ordering the officers to pick Williams up by his arms and legs, not by the restraints. The video footage shows four officers carrying Williams back to his cell, not by the restraints but by his arms and legs, in compliance with Duncan's instruction. See id. Thus, Williams and Johnson's assertions that Duncan ordered Williams to be hogtied and that the officers pick Williams up by his restraints are refuted by the record.

Next, the Court finds that Williams' description about what happened when he was returned to his cell is also refuted by the video footage. Contrary to Williams' assertions, the officers do not "throw" or "toss" him into his cell. See id. Rather, the four officers enter the cell—three first with the fourth following after—and then place him down. Admittedly, the officers do not appear to bend down far, and Williams may drop a short distance to the floor. However, while the video footage does not clearly show all that transpired inside the cell, what is obvious, is that the officers did not "throw" or "toss" Williams into the cell.[10]

---

[9] Notably, Williams himself acknowledges that he tried to kick the Sergeant and the video confirms that he did. Indeed, it shows him make a kicking motion so swiftly that his shoe flies off his foot.

[10] Of course, to the extent Williams attributes any malice to Duncan as a result of the officers' actions, he has failed to demonstrate a causal connection. Importantly, Duncan did not help carry Williams into the cell and Williams has failed to even allege, much less point to any evidence supporting an inference, that Duncan ordered the officers to drop him.

Finally, Williams' assertion that he was unable to stand or walk after being left shackled in his cell is also directly contradicted by the video evidence. The video unmistakably shows Williams standing and yelling behind the window of the cell door only moments after the guards place him on the floor and exit his cell. See id. Not only does he stand, but Williams can be seen pacing back and forth. See id. Thus, the assertion by Williams and Johnson that Williams could not stand because the restraints were too tight is untenable.

In light of the undisputed video evidence, the Court will not credit the assertions that Williams was restrained while wearing only pants, that Duncan ordered him to be "hogtied" after he attempted to kick the Sergeant, that he was "tossed" into his cell, or that he was unable to move or stand inside his cell while restrained. See Scott, 550 U.S. at 380-81 (refusing to credit the plaintiff's sworn declaration that officers deployed two cans of pepper spray where the video evidence clearly depicted only two short blasts). See also Pourmoghani-Esfahani, 625 F.3d at 1315; Morton, 707 F.3d at 1284.

Notably, the video reflects that Williams was fully restrained from the time he was removed from his cell until the officers returned him to his cell. However, even if the restraints had been applied after he attempted to kick the Sergeant, the video evidence and Williams' own admission that he attempted to kick the Sergeant would establish the officers were well within their discretion to use such force against Williams. See Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991) (per curiam) (holding that the placement of an inmate in four-point restraints was "both prudent and proper" because the inmate's conduct caused the prison officials to discontinue their rounds and threatened to incite a disturbance in the segregation unit). See also Whitley v. Albers, 475 U.S. 312, 322 (1986)

("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of . . . security measure[s] taken in response to an actual confrontation with riotous inmates.") (internal quotations and citations omitted) (first alteration in original). Accord Williams, 943 F.2d at 1575; Ort v. White, 813 F.2d 318, 321-22 (11th Cir. 1987). The only question remaining, therefore, is whether Williams has produced evidence that demonstrates a genuine issue of material fact that the continued use of restraints amounts to an Eighth Amendment violation.

The question of how long restraints may be employed to calm an aggressive inmate following a disturbance "becomes somewhat problematic." Williams, 943 F.2d at 1575. This is so because, after the behavior giving rise to the need to exert force has ceased, the continued use of force may constitute "punishment." Hope v. Pelzer, 536 U.S. 730, 743 (2002) ("[P]hysical abuse directed at [a] prisoner after he terminate[s] his resistance to authority would constitute an actionable eighth amendment violation.") (internal quotation marks omitted; alterations and emphasis in original) (quoting Ort, 813 F.2d at 324). However, simply placing an inmate in restraints does not necessarily mean that the threat has "ceased." See Scroggins v. Davis, 346 F. App'x 504, 506 (11th Cir. 2009) (citing Williams, 943 F.2d at 1576). A panel of the Eleventh Circuit Court of Appeals has explained:

> The Constitution does not require prison officials to release from restraint a dangerous inmate who has lashed out at them simply because he has stopped lashing out for the time being. Indeed, given that four-point restraints make it difficult for an inmate to engage in any kind of physical misbehavior, [the plaintiff's] position [that continued use of restraints results in application of excessive use of force] would mean that four-point restraints could never be continued for longer than a few minutes at a time. We know from the Williams decision that is not the law.

Id.

In <u>Williams</u>, the court held that the continued use of restraints, including taping the plaintiff's mouth closed, for a period of twenty-eight and one-half hours did not constitute excessive use of force. 943 F.2d at 1576. In affirming the district court's grant of summary judgment, the court found significant that the plaintiff was a high-risk inmate with a history of disobedience, the plaintiff's hostile behavior had the potential to incite other inmates on his wing, and prison officials consistently monitored the plaintiff, permitting him restroom and meal breaks. <u>Id.</u> at 1576, 1580.

> How long restraints may be continued calls for the exercise of good judgment on the part of prison officials. Once it is established that the force was applied in a good faith effort to maintain discipline and not maliciously or sadistically for the purpose of causing harm, the courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline.

<u>Id.</u> at 1576 (internal citations omitted). <u>See also</u> <u>Scroggins</u>, 346 F. App'x at 505-06 (holding a three-hour use of four-point restraints was not excessive where the officials checked the inmate every fifteen minutes, and the inmate did not inform any official that he was experiencing pain or discomfort).

The <u>Williams</u> decision instructs that an inmate's Eighth Amendment claim based upon a prolonged use of restraints in response to an outburst implicates the deferential "excessive force" standard. <u>Id.</u> The Eleventh Circuit, in an unpublished decision, has also analyzed the extended use of four-point restraints under the "conditions-of-confinement," or "deliberate indifference" standard. <u>See</u> <u>Burke v. Bowns</u>, 653 F. App'x 683, 699-701

(11th Cir. 2016).[11] Under the conditions-of-confinement standard, only "[a] prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994). To show deliberate indifference, a plaintiff must demonstrate the prison official engaged in more than mere negligence. Id. at 828, 835-36. To be liable under the Eighth Amendment, a prison official must know "of an excessive risk to inmate health or safety and disregard[] that risk." Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing Farmer, 511 U.S. at 837). Thus, to establish an Eighth Amendment violation, an inmate must show that the prison official "actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007) (citing Farmer, 511 U.S. at 837, 844). "The known risk of injury must be a 'strong likelihood, rather than a mere possibility' before a guard's failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F. 2d 1533, 1537 (11th Cir. 1990). To satisfy the subjective knowledge requirement, a plaintiff must show that a prison official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Farmer, 511 U.S. at 837.

---

[11] Other circuits that have addressed this issue have expressed or implicitly recognized the difficulty of deciding which standard is more appropriate when restraints are used for a prolonged period in response to an inmate's outburst. See, e.g., Young v. Martin, 801 F.3d 172, 178 (3d Cir. 2015) (directly addressing the parties' dispute of which "legal framework applies in the face of a claim that the use of mechanical restraints violated a prisoner's Eighth Amendment rights" and holding the appropriate standard is the Whitley excessive force analysis); Fuentes v. Wagner, 206 F.3d 335, 345 (3d Cir. 2000) (recognizing that the plaintiff's Eighth Amendment claim based on the prolonged use of a restraint chair—eight hours—did "not neatly fit into either the 'excessive force' category or the 'conditions of confinement' category," but noting that both "categories" require the plaintiff to demonstrate that the prison official acted with a "sufficiently culpable state of mind," which the plaintiff failed to do); Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999) (declining to consider whether the twenty-four-hour restraint violated the more deferential Whitley excessive force standard because the court held the restraint did not violate the deliberate indifference standard and the parties agreed the deliberate indifference standard was appropriate).

In Burke, the Eleventh Circuit affirmed entry of summary judgment in favor of the defendants, holding that the plaintiff failed to produce evidence that the defendants were deliberately indifferent with respect to two instances of prolonged use of restraints: five days on one occasion and six hours on another. 653 F. App'x at 700, 701. As to the five-day restraint, the court held that the plaintiff failed to introduce any evidence "that [d]efendants were aware of and recklessly disregarded a substantial risk to [p]laintiff's health or safety." Id. at 700. To the contrary, the court noted, the defendants monitored the plaintiff's condition at regular intervals, they provided him all meals,[12] and the plaintiff refused medical assessments and the defendant's offers to remove the restraints. Id.

As to the six-hour restraint, the plaintiff alleged that his conditions of confinement lacked basic sanitation because he "was forced to bleed, urinate, and defecate on himself." Id. (internal quotation marks omitted). The court held that the plaintiff failed to raise a genuine issue of material fact because he submitted no evidence that the defendants knew that he was bleeding or needed to use the toilet. Id. at 701. See also Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999) (holding that the use of four-point restraints for a period of twenty-four hours did not deprive the plaintiff of "the minimal civilized measures of life's necessities," even though the plaintiff alleged he had difficulty sleeping and attending to his bodily functions, because he was regularly monitored, provided food and bedding, and was able to use the facilities).

Regardless of whether the "excessive force" or "deliberate indifference" standard is applied in a continued-use-of-restraints case, courts inquire "into a prison official's state of mind . . . ," Wilson v. Seiter, 501 U.S. 294, 299 (1991), with the ultimate question being

---

[12] The court did not credit the plaintiff's argument in his response to the defendant's motion for summary judgment that, because of the restraints, he was unable to eat the meals he was provided. Id. at 700 n.20.

whether the officer acted with "a desire to inflict unnecessary and wanton pain." <u>Hudson v. McMillian</u>, 503 U.S. 1, 5 (1992).[13] The Eleventh Circuit analyzes a number of factors to determine whether a prison official acts with a culpable state of mind: (1) whether the inmate is provided or denied basic necessities and facilities; (2) whether prison officials regularly monitor the inmate; (3) whether the defendant knows that the inmate is suffering; (4) whether the inmate has a history of disciplinary or violence problems; and (5) whether the inmate receives or is offered a medical examination either during or at the end of the restraint period. <u>See, e.g.</u>, <u>Williams</u>, 943 F.2d at 1576; <u>Scroggins</u>, 346 F. App'x at 506; <u>Burke</u>, 653 F. App'x at 699-701.

Under either the excessive force standard or the conditions-of-confinement standard, Williams provides no evidence to permit a jury to conclude that Duncan acted with a sufficiently culpable state of mind to support an Eighth Amendment violation. First, applying the binding Eleventh Circuit precedent, the Court finds that Williams has provided no evidence that Duncan ordered that Williams remain restrained maliciously and sadistically for the purpose of causing him harm. <u>See</u> <u>Williams</u>, 943 F.2d at 1576 (citing <u>Whitley</u>, 475 U.S. at 321-22). Duncan avers, and the video evidence confirms, that Duncan ordered the continued use of restraints because of Williams' assault on the Sergeant. <u>See</u> Def. Ex. A; Ex. D ¶ 3. Further, it is undisputed that officers placed Williams in his cell, fully restrained and fully clothed, at 10:50 a.m., <u>see</u> Ex. A; Ex. D. ¶ 3, and that Duncan's shift ended at 6:00 p.m., <u>see</u> Ex. D ¶ 11; Ex. C at 11; Johnson Dec. Thus, the

---

[13] Because "wantonness does not have a fixed meaning," a determination of the applicable legal standard depends upon identification of the nature of the conduct of which a plaintiff complains. <u>Wilson</u>, 501 U.S. at 302. <u>See also</u> <u>Hudson</u>, 503 U.S. at 5 ("What is necessary to establish an unnecessary and wanton infliction of pain . . . varies according to the nature of the alleged constitutional violation.").

period of restraint for which Duncan can be responsible—seven hours and ten minutes—is far shorter than the twenty-eight-hour period the court held did not offend Eighth Amendment principles in the <u>Williams</u> case.[14] <u>See</u> 943 F.2d at 1574. And, in the <u>Williams</u> case, the nature of the restraint was not only for a longer duration, but more physically-limiting and uncomfortable given that the plaintiff there was gagged as well. <u>See</u> <u>id.</u> The seven-hour period of restraint is also shorter than some of the stretches of time the <u>Williams</u> plaintiff was shackled between breaks without the use of the restroom. <u>See</u> <u>id.</u> at 1578. (Pittman, J., dissenting) (noting that stretches between breaks lasted up to nine to ten hours).

Even if Duncan can be held responsible for the full sixteen-hour period of restraint, that length of time, under the facts presented here, falls well within the constitutional parameters articulated by the Eleventh Circuit. <u>See</u> <u>id.</u> at 1576. Moreover, this Court is mindful of the need "to show great latitude to the discretion of prison officials in inmate management." <u>Id.</u> Duncan avers that he kept Williams restrained, even when his shift ended, because Williams continued to demonstrate aggressive behavior. <u>See</u> Ex. D ¶¶ 9, 11. Notably, Williams was confined in a close management unit, and Duncan, in his judgment, much like the officers in the <u>Williams</u> case, decided that he should remain restrained until his "violent nature ha[d] abated." <u>See</u> <u>Williams</u>, 943 F.2d at 1579; Ex. D ¶¶ 9, 11.

---

[14] Not only does Duncan aver in his declaration that his shift ended at 6:00 p.m., Ex. D ¶ 11, even Williams acknowledges that all officers working the day shift, including Duncan, left work at 6:00 that evening, <u>see</u> Ex. C at 11. Moreover, inmate Johnson confirms that Duncan left the prison that day at 6:00 p.m. <u>See</u> Johnson Dec. To the extent that Williams suggests that Duncan was the only person who could order the removal of the restraints, his own testimony belies the claim. Williams testified at his deposition that, after Duncan's shift ended, Lt. Esipito was the lieutenant on duty, that Lt. Esipito said he was going to leave Williams in the restraints, and that Lt. Esipito was the person who eventually released him from restraints and took him to the medical unit. <u>See</u> Ex. C at 13.

Further, the undisputed evidence shows that Williams was closely monitored and received basic necessities while restrained. According to Duncan,

> security staff checked on Inmate Williams every thirty minutes and medical staff checked on him every two hours. When asked by security staff whether he was ready to relinquish his restraints, [Williams] became aggressive and refused, forcing security staff to continue checking on him every thirty minutes during my shift. Inmate Williams had access to a toilet and sink combination which was fully operational at all relevant times and his restraints were not so tight that he could not use it. In fact, Inmate Williams slipped out of his waist chain and brought his cuffed hands around the front of his body. Before leaving at 6 p.m. on June 4, 2015, I checked on Inmate Williams one last time. I asked Inmate Williams if he was finally ready to relinquish his restraints. He told me to "f*** off." Inmate Williams had not urinated or defecated on himself when I left for the day and he did not indicate that he needed to use the restroom at that time.

Ex. D ¶¶ 8-12. Duncan also avers that Williams declined a post-use-of-force medical examination, telling the nurse, who arrived moments after the escorting officers returned him to his cell, to "get away" and that he would "spit in her face." See Ex. D ¶ 7; see also Ex. A. With the exception of Williams' claim that he could not stand, which the Court has rejected, and his claim that he had no running water,[15] nothing in the FAC, Williams' deposition, or Johnson's declaration conflicts with or disputes Duncan's declaration. Notably, Williams admitted in his deposition that staff checked on him every thirty minutes and medical checked on him every two hours. See Ex. C at 11. He also admitted that the nurse refused to provide a cell-front post-use-of-force exam because he "was talking very aggressive" to her,[16] see id., and that upon release from his restraints at 3:00 or 3:30

---

[15] Williams asserts in his FAC that Duncan left him restrained in his cell "with no running water." See FAC at 6. If, indeed, there was no running water, Williams has offered no evidence that Duncan was aware of this fact, nor has he asserted that a lack of running water prevented him from using the toilet.

[16] Nurse Kissinger filed a disciplinary report against Williams for verbally threatening her, and Williams pled guilty to that charge. See Ex. B at 1, 9.

a.m.,[17] a nurse did examine him, see id. at 13; see also Ex. E at 5. Nowhere does Williams

allege that he had urinated or defecated on himself before Duncan's shift ended, nor does

he point to evidence suggesting that Duncan ever knew that he needed to use, and was

unable to use, the restroom. Last, Williams has failed to dispute Duncan's testimony that

before he completed his shift, Duncan asked whether Williams was ready to "relinquish

his restraints." In short, Williams fails to point to evidence supporting even an inference

that Duncan acted maliciously, sadistically, or for the purpose of causing Williams harm

when he ordered that Williams remain restrained.

Applying the more exacting conditions-of-confinement standard, Williams also fails

to produce evidence that creates a jury question as to whether Duncan was deliberately

indifferent to a serious risk to his health or safety. The closest Williams comes to providing

evidence that Duncan was deliberately indifferent to a serious risk of harm is in Johnson's

declaration. In his declaration, Johnson states that, while Williams was restrained, prison

officials did not feed him lunch or dinner,[18] and Williams "kept yelling he wanted the

restraints off." Johnson Dec. Johnson also states that, after Duncan's shift ended at 6:00

p.m., Williams "was still on the floor saying he [had] to use the restroom but [could not]

get up" because the restraints were too tight. Id. As noted above, the assertions that

_____

[17] At his deposition, Williams stated that he was removed from his cell at 3:00 a.m. to be taken to medical. However, in response to defense counsel's questions, he agreed that Lt. Esipito removed him at 3:30 a.m. See Ex. C at 10, 12. The medical report reflects 3:00 a.m. as the time of the exam. See Ex. E at 5.

[18] In his one-page Response Williams states that he "was denied 2 meals due to them not unshackling or removing restraints to allow him to eat." See Response ¶ 3. In his deposition, Williams testified that, as officers made rounds while he was restrained in his cell, he asked them how he was supposed to "eat like this," and "they bucked [him] on two meals." Ex. C at 11. Williams does not assert that Duncan ordered that he not receive meals. His statements may imply that he received the meals but was unable to eat them because of the restraints. Construing the facts in the light most favorable to Williams, the Court will assume that Williams was denied two meals during the time that he was restrained, and that the denial is attributable to Duncan.

Williams could not get up are refuted by the video evidence. Accepting as true, however, that Williams was physically unable to use the in-cell toilet and that he was denied two meals, Williams still has failed to produce evidence demonstrating a genuine issue of material fact as to whether Duncan's actions constitute deliberate indifference to a substantial risk to his health or safety.

While "the deprivation of basic sanitary conditions can constitute an Eighth Amendment violation," Brooks v. Warden, 800 F.3d 1295, 1304 (11th Cir. 2015), Williams has presented no evidence that Duncan was aware that Williams had urinated or defecated on himself. See Burke, 653 F. App'x at 701. Cf. Brooks, 800 at 1305 (holding the defendant prison guard "was plainly aware of the risk" the plaintiff faced when the guard forced the plaintiff to remain in his excrement-filled jumpsuit for two days after the plaintiff begged the guard to permit him to change clothes).[19] In fact, Duncan avers in his declaration that when he last checked on Williams before his shift ended, Williams had not urinated or defecated, nor did Williams indicate a need to use the restroom. See Ex. D ¶ 12. Not only has Williams not disputed this evidence, but the medical report of Williams' post-restraint exam, which occurred at 3:00 a.m., does not reference that Williams had urinated or defecated on himself. See Ex. E at 5-6. There simply is no evidence that Williams or anyone else reported to Duncan that Williams had urinated or defecated on himself while restrained.[20]

---

[19] The Brooks court applied the deliberate indifference analysis with respect to the plaintiff's Eighth Amendment claim. In that case, however, the plaintiff was kept in maximum-security restraints for three days while he was hospitalized following an inmate attack on him. 800 F.3d at 1298. The plaintiff was not the aggressor, nor did the prison guards use force against the plaintiff in response to his aggression or disobedience. Thus, the excessive force analysis was not relevant in the first instance. The plaintiff's claim was based purely on the conditions of his confinement while restrained in the hospital. Id.

[20] Williams testified at his deposition that he told Lt. Esipito, at about 7:30 p.m., after Duncan's shift ended, that he had urinated and had a bowel movement on himself. Williams did not suggest that he made the

Finally, with respect to Williams' claim that he was denied two meals, his allegations do not demonstrate deliberate indifference as a matter of law. "The Constitution requires that prisoners be provided reasonably adequate food." Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir.1985) (citations and punctuation omitted). Whether a denial of food equates to deliberate indifference to a prisoner's health or safety "depends on the amount and duration of the deprivation." Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1999). Even accepting his allegations as true, Williams does not assert or provide any evidence that he suffered or was exposed to a health risk caused by the denial of two meals. See id. at 508 (holding that the plaintiff did not state an Eighth Amendment claim for the denial of food where he failed to allege he suffered adverse physical effects). At most, Williams implies that Duncan knew he faced a "mere possibility" of a health risk. See Burke, 653 F. App'x at 701. However, a prison official's "knowledge of a mere possibility of certain harm befalling [an inmate] because he was in four-point restraints is insufficient to establish deliberate indifference." Id.

Here, Williams has asserted that he was uncomfortable and hungry during the time he was restrained. "The Constitution . . . does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal citations and quotations omitted) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 349 (1981)). Because Williams has introduced no evidence that Duncan imposed the continued use of restraints maliciously and sadistically for the

---

same complaints to Duncan before his shift ended that day. See Ex. C at 11.

purpose of causing harm or with deliberate indifference to a serious health risk, Duncan is entitled to entry of summary judgment in his favor.[21]

At summary judgment, a moving party discharges its burden by "showing" the absence of evidence necessary to support the non-moving party's claim. <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593 (11th Cir. 1995) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). Given the record evidence, the Court finds Duncan has met his initial burden of showing that the continued use of restraints for over sixteen hours did not violate the Eighth Amendment under the circumstances of this case. Once a moving party has discharged its burden, the non-moving party cannot rest on his pleadings, but rather must come forward with evidence showing that there is a genuine issue for trial. <u>Id.</u> at 593-94 (citing <u>Celotex</u>, 477 U.S. at 324). This, Williams has not done. Upon review of the record, the Court concludes that there are no genuine issues of material fact with respect to Williams' Eighth Amendment claim against Duncan that prevent the entry of summary judgment in Duncan's favor.[22]

Therefore, it is now

**ORDERED**:

1.     Defendant Duncan's Motion for Summary Judgment (Doc. 40) is **GRANTED**.

---

[21] Williams' assertion that Duncan violated FDOC policy by keeping him restrained for longer than six hours, <u>see</u> FAC at 6, at most suggests negligence, not deliberate indifference.

[22] In light of the Court's ruling, it is unnecessary to address Duncan's remaining arguments that he is entitled to qualified immunity and that 42 U.S.C. § 1997e(e) bars Williams' claim. Notably, however, were the Court to address qualified immunity, the Court's finding that Duncan did not violate Williams' constitutional rights would warrant entry of summary judgment in Duncan's favor. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S 223, 232, 236 (2009) (recognizing that if a plaintiff fails to show <u>either</u> a constitutional violation or that the right violated was not clearly established, the defendant will be entitled to qualified immunity).

2.      The Clerk is directed to enter judgment in favor of Defendant Lieutenant Brian Duncan, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 14th day of August, 2018.

MARCIA MORALES HOWARD
United States District Judge

Jax-6
c:
Mark Williams
Counsel of Record